UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BERNARD J. SCHAFER,
HENRY BLOCK,

          Plaintiffs,

v.                              Case Number 09-10349-BC
                                      Honorable Thomas L. Ludington

DAVID R. JOHANSON, et al.,

          Defendants.

_____ /

## ORDER DENYING WITHOUT PREJUDICE DEFENDANT ATTORNEYS AND LAW FIRM'S MOTION TO DISMISS CLAIMS AGAINST ATTORNEY DEFENDANTS OR TO COMPEL ARBITRATION AGAINST THEM AND TO DISMISS TWO ATTORNEY DEFENDANTS FOR LACK OF PERSONAL JURISDICTION, DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR AFFIRMATIVE RELIEF THAT THE CLAIMS BY PLAINTIFFS AGAINST THE JOHANSON DEFENDANTS ARE NOT ARBITRABLE, AND DENYING AS MOOT WACHOVIA SECURITIES MOTION TO DISMISS CLAIMS/COMPEL ARBITRATION

On February 2, 2009, Plaintiffs Bernard J. Schafer ("Schafer") and Henry Block ("Block") filed a six-count amended complaint [Dkt. # 2] against various Defendants, alleging the following claims under state law: (1) negligence - malpractice; (2) negligence; (3) breach of contract; (4) fraud; (5) fraudulent concealment; and (6) concert of action. Plaintiffs have named as Defendants four individual attorneys, the law firm for which the four attorneys work, and twelve other individuals and entities that Plaintiffs allege participated in a fraudulent scheme with the Defendant-attorneys and law firm.

Now before the Court are the following three motions: (1) Defendant-attorney and law firm's motion to dismiss claims against attorney Defendants or to compel arbitration of claims against them and to dismiss two attorney Defendants for lack of personal jurisdiction [Dkt. # 9]; (2) Plaintiffs'

motion for affirmative relief that the claims by Plaintiffs against the Johanson Defendants are not arbitrable [Dkt. # 21]; and (3) Defendant Wachovia Securities motion to dismiss or compel arbitration [Dkt. # 17].  Additionally, Defendant-attorneys and law firm filed a "response" [Dkt. # 44], contesting the effectiveness of Plaintiffs' notice of voluntary dismissal [Dkt. # 39] as to Defendant Wachovia Securities.  A hearing was held on the motions on July 7, 2009.

I

Unless otherwise indicated, the following facts, as outlined hereafter, were located in Plaintiffs' first amended complaint:

Plaintiffs Schafer and Block are residents of Michigan.  Plaintiffs allege claims against four attorneys– David Johanson, Theresa Huang, Rachel Markun, Rhonda Connor– and the law firm for which the attorneys work– Johanson & Berenson, LLP.  The Defendant-law firm maintains offices in Napa, California; Washington, D.C.; Cary, North Carolina; and in Arlington and Great Falls, Virginia.  The four Defendant-attorneys reside in California.

Plaintiffs allege that the Defendant-attorneys represented to Plaintiffs that they furnish specialty advice regarding investment vehicles by which certain loan transactions can be utilized in order to accomplish tax savings.  More specifically, Plaintiffs allege that the Defendant-attorneys and law firm represented that they are specialists in the practice of law related to employee stock ownership plans ("ESOP") and trusts ("ESOT").  *See also* Pl. Resp. Br. Ex 1; [Dkt. # 19-3] (pages from Johanson & Berenson LLP's website, describing the law firm's "expertise" and "specialized services").

In their motion to dismiss or compel arbitration, the Defendant-attorneys and law firm generally explain that 26 U.S.C. §§ 402 and 1042 make it possible for a corporation to contribute

tax deductible dollars to an ESOT, for the ESOT to pay such contributions to selling shareholders, and for the selling shareholders to defer taxation on a capital gain if certain requirements are met. The requirements identified by § 1042 include, inter alia, that the stock sold meets the definition of "qualified securities," as defined by subsection (c)(1); that the stock is sold to an ESOP or eligible worker-owned cooperative, as defined by subsection (b)(1), which holds at least thirty-percent of the outstanding stock of the corporation after the sale, § 1042(b)(2); and that the gain from the sale is used to purchase "qualified replacement property" ("QRP") as defined by subsection (c)(4), within the "replacement period," as defined by subsection (c)(3), § 1042(a)(2).

Plaintiffs also allege claims against several non-attorney individuals and entities who they allege established relationships with the Defendant-attorneys and law firm and were involved in making purported investments on behalf of Plaintiffs using a variety of investment vehicles. These defendants include Defendant Robert Eddy, who Plaintiff alleges was employed by or an agent of Defendants Wachovia Securities and Sierra ESOT Advisors; Defendant Jesup & Lamont Securities; Defendant William Chapman, who appears to be somehow connected to or associated with Defendant Alexander Capital Markets; and Defendant Jesse Churley, who the complaint suggests is somehow connected to Defendant Emerging Money Corp.[1]

Plaintiffs also allege claims against Defendant Mitchell Matt Donnelly, a.k.a. "Frenchy," who Plaintiffs allege represents himself as a business valuation or appraisal specialist for purposes of determining values associated with a variety of ESOP transactions. Plaintiffs also allege claims

---

[1] On July 7, 2009, Plaintiffs filed a notice of voluntary dismissal as to Defendant Emerging Money Corp. [Dkt. # 38]. Defendant had not yet filed an answer or motion for summary judgment; thus, Plaintiffs' voluntary dismissal is effective without entry of an order by the Court. *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

against Defendants Robert Strauss,[2] T&C Bank, and Business Appraisal Institute, but the amended complaint does not provide any information as to these Defendants' specific involvement in the acts or omissions giving rise to Plaintiffs' claims.

Plaintiffs' amended complaint contains several general allegations against Defendants, "collectively." These include the following three main allegations:

(1) The business valuation and business appraisals accomplished by the Defendants have been challenged by the Department of Labor;

(2) Defendants, collectively, were involved in taking certain proceeds from ESOP transactions under circumstances where they were charged with responsibility to make certain investments utilizing "qualified replacement property"; and

(3) Defendants, collectively, have been involved in an elaborate scheme of transactions, resulting in substantial taxes, sanctions, interest and the loss of benefit of several, serial ESOP transactions organized, managed, supervised, documented, and processed by the Defendants. Johanson has selected, on numerous occasions, participants in this business relationship wherein the objective was to avoid dealing with reputable, credible professionals and, instead, the selected participants willing to assist him in perfecting his elaborate scheme of misconduct.

The amended complaint describes four main ESOP or ESOT transactions, labeled by the year that the transaction is alleged to have become effective, including 2003, 2004, 2005, and 2006. The Defendant-attorneys and law firm's motion to dismiss or compel arbitration clarifies that the transactions challenged by Plaintiffs involve three companies– Michigan Microtech, Inc. ("Michigan Microtech"), a Michigan corporation; DirecTECH Southwest, Inc., formerly known as Comm-Craft, Inc. ("DTSW/Comm-Craft"), a Louisiana corporation; and DirecTECH Delaware, Inc. ("DirecTech"), a Delaware corporation– of which Plaintiffs were shareholders and for which the Defendant-law firm served as outside corporate counsel. [Dkt. # 9]. Defendants represent that as

---

[2] On July 7, 2009, Plaintiffs filed a notice of voluntary dismissal as to Defendant Robert Strauss. [Dkt. # 38]. Defendant had not yet filed an answer or motion for summary judgment; thus, Plaintiffs' voluntary dismissal is effective without entry of an order by the Court. *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

of June 1, 2005, Plaintiffs were also shareholders in a parent corporation, DirecTECH Holding Co., Inc. ("DTHC"), for which the Defendant-law firm served as outside general counsel from June 1, 2005 to January 15, 2009.  [Dkt. # 9].  The parties' papers do not reflect any other information about whether these corporations have other shareholders, their capitalization, or economic status.  The companies are represented to be involved in the sale of cable and satellite television systems.

First, in a transaction that was to be effective December 31, 2003, Plaintiffs allege that they participated in transactions involving DirecTech, establishment of an ESOP and ESOT, and the sale of Plaintiffs' stock.  Plaintiffs allege that the Defendant-law firm drafted the 2003 transaction documents and supervised the closing.  Plaintiffs represented at the hearing that Defendant Mitchell Donnelly appraised Plaintiffs' shares of DirecTech.  Plaintiffs allege that each Plaintiff expected to receive $2,800,000 in aggregate funds from the transactions.  Plaintiffs allege that they received approximately $280,000 in cash, and an unfunded promissory note from DirecTech for the balance.  At hearing, Plaintiffs represented that no lenders were involved in this aspect of the transaction; employees have been making on-time payments to Plaintiffs.

Generally, Plaintiffs allege that the Defendant-law firm subsequently supervised and directed the transfer of funds, the establishment of bank and brokerage accounts, and the purchase of QRP for Plaintiffs.  At hearing, Plaintiffs represented that Defendant Johanson located the lenders to purchase QRP utilizing a non-recourse loan.  Plaintiffs further allege that Defendant Eddy, then employed by Defendant Wachovia Securities, became the trustee of the DirecTech ESOT and participated in placement of the QRP for Plaintiffs, with Defendant Johanson's direction and assistance, with Defendant Alexander Capital Markets and  non-defendant Optech.  Plaintiffs represented at hearing that they did not receive checks from the lenders.  Plaintiffs represented that

-5-

they do not have documentation of the loans between Plaintiffs and other entities; they generally received documents from the Defendant-attorneys and law firm and were directed to "sign here."

Also related to the 2003 transaction, Plaintiffs allege that in 2006, Defendant Johanson purportedly visited Optech in Hong Kong and, notwithstanding the fact that he determined that Optech could not prove that it still held the QRP investments that were to have been acquired after the 2003 transaction, instructed Defendants Eddy and Sierra ESOP Advisors to make additional QRP investments through Optech for Plaintiffs.

Second, Plaintiffs engaged in transactions taking place on or about December 7, 2004, related to Michigan Microtech, and involving the establishment of an ESOP and ESOT and the sale of Plaintiffs' shares of common stock.  In their amended complaint, Plaintiffs allege the details of Plaintiff Schafer's transaction, and allege that Plaintiff Block participated in a "similar transaction." Plaintiffs allege that under the terms of the transaction, Plaintiff Schafer was to receive $4.2 million as the aggregate purchase price for the shares that were transferred by him to the ESOP.  Plaintiffs allege that Schafer received less than $100,000 in cash, and that the balance was to be paid to him in accordance with a promissory note issued by the Michigan Microtech ESOT.

Plaintiffs allege that the purported acquisition of QRP investments was supervised by Defendants, invested through Defendant Alexander Capital Markets and Emerging Money Fund, in an effort to purchase QRP assets in a ten-percent down, ninety-percent loan transaction.  Plaintiffs allege that a conflict of interest developed when the Defendant-attorneys and law firm developed an attorney-client relationship with Michigan Microtech after already developing an attorney-client relationship with Plaintiffs, DirecTech, Woody Bilyeu, and Jay Basil Mattingly.  Plaintiffs further allege that conflicts of interest existed based on the Defendant-attorneys and law firm's relationships

-6-

with Defendants Eddy, Sierra ESOT Advisors, Wachovia Securities, Jesup & Lamont Securities, Chapman, Alexander Capital, Churley, Emerging Money Corp, Mitchell Donnelly, and non-defendant First Clearing LLC.  Plaintiffs allege that Defendant Eddy was named to the board of trustees for the Michigan Microtech ESOP despite multiple conflicts of interest.  Plaintiffs further allege that these relationships were established so that Defendants could secure fees, fiduciary relationships, management fees, referral fees, transaction fees, and to assert unlawful control over Plaintiffs' assets.

Third, Plaintiffs allege that the 2005 transaction involved DirecTech's participation in an ESOP transaction involving DTSW/Comm-Craft, on or about May 31, 2005.  Plaintiffs allege that as of that point in time, "Johanson had arranged to have himself named as a Director and Secretary of [DTSW-Comm-Craft]."  Plaintiffs allege that under the terms of the transaction, Plaintiff Schafer was to receive $1,116,724 as the aggregate purchase price for shares that were transferred by him to the ESOP.  Plaintiffs allege that a similar transaction was processed by Defendant Johanson for Plaintiff Block.

Similar to the 2003 and 2004 transactions, Plaintiffs further allege that Defendants directed the transfer of funds, were responsible for directing the purchase of QRP assets, and caused the transactions to be accomplished through Defendants Alexander Capital Markets, Emerging Money Corp, and non-defendant Optech.  Plaintiffs allege that Defendant Eddy, "in concert with" Defendant-attorney Connor, negotiated with Defendants Emerging Money Corp. and Strauss to determine placement of QRP.

Fourth, Plaintiffs allege that the 2006 transaction involved another ESOT sale coordinated by Defendants, through which Plaintiff Schafer was to receive $1,010,084 as the aggregate purchase

price for shares that were transferred by him to the ESOP.  Plaintiffs allege that the sale resulted in

an exchange of stock between DTHC and the Bernard J. Schafer Trust, LLC, which was established

by Defendants.  Plaintiffs allege that the purported purchase of QRP related to the transaction was

accomplished through an Optech account.  Plaintiffs allege that a similar transaction was processed

by Defendant Johanson for Plaintiff Block.

Plaintiffs also generally allege that the Defendant-attorneys participated in the following

additional activities on their behalf through 2008: (1) supervising extensions for tax filings by

Plaintiffs; (2) determining when and whether to file for § 1042 elections; (3) management of the

ninety-percent equities loans; (4) supervision of the filing of applications for non-recognition of

gain; and (5) purchase, placement, and acquisition of QRP, including the selection of brokers and

companies with whom Plaintiffs were directed to conduct business.  Plaintiffs also allege that

Defendant Markun "and others" undertook responsibility and communicated directly with an IRS

agent on behalf of Plaintiff Schafer, and managed the responses to tax inquiries by the IRS agent and

Plaintiff Schafer's accountant.

Plaintiffs allege that Defendants induced Plaintiffs to invest in Ricor North America Holding

LLC, notwithstanding conflicts of interest between Plaintiffs and Defendants.  Plaintiffs allege that

Defendant Johanson invested himself as President of RICOR North America Holding LLC and

identified Defendant Markun as the Secretary.  Plaintiffs allege that through the establishment of

the LLC, Defendants continued to secure investments from Plaintiffs and to obtain undue control

over Plaintiffs' access to their investments, eventually diverting those funds to Defendants' own

interests.  Plaintiffs make similar allegations as to Futuretek LLC.

Plaintiffs' brief in response to the Defendant-attorneys and law firm's motion to dismiss or

compel arbitration sets forth several more factual allegations.  [Dkt. # 19].  Plaintiffs contend that over the years, Defendant Johanson directed Plaintiffs to wire funds for their personal investment portfolio to a number of entities that had been selected by Johanson to purchase QRP for Plaintiffs. These entities included Defendants Eddy, Wachovia Securities, Alexander Capital Markets, Jesup & Lamont, Sierra ESOT Advisors, and non-defendants Optech and PNC Bank.  Plaintiffs contend that Defendant Johanson and the Defendant-law firm repeatedly assured Plaintiffs that the law firm had confirmed the good standing of the brokerage firms and lenders involved in the transactions, and confirmed the tax treatment of the QRP transactions.

Plaintiffs contend that they later discovered that the QRP did not qualify because it was either sold too soon, without Plaintiffs' knowledge or authorization, or it had never been purchased. Plaintiffs contend that the Defendant-attorneys and law firm eventually furnished advice to Plaintiffs through their Michigan accountants, in an attempt to convince Plaintiffs to engage in evasive tactics with the IRS.  Plaintiffs contend that, at this point, they do not have access to any purported QRP investments, nor access to the funds turned over to brokers at Defendant Johanson's direction.

Plaintiffs contend that Defendant Johanson and the law firm not only set up the ESOP transactions, they also provided services for Plaintiffs individually, including: (1) advice and recommendations of tax deferral strategies to Plaintiffs for their individual tax returns; (2) advice regarding what qualifies as QRP for tax purposes; (3) selection of brokerage houses to purchase and hold QRP for Plaintiffs; and (4) representation of each Plaintiff in their later dispute with the IRS over the tax deferral scheme recommended and implemented by Defendant Johanson.

Count 1 of the amended complaint, entitled "negligence - malpractice" appears to be directed at the Defendant-attorneys and alleges they committed the following negligent acts:

1.      Negligently secured advice and counsel, and furnished advise (sic) and counsel, from a variety of brokers, investment managers, and financial planners regarding the acquisition of certain "qualified replacement property" under circumstances where the consultants failed to comply with the rules and regulations governing QRP, acquisition and holding of QRP, and the related rules and regulations;

2.      Negligently structured the ESOP transaction and the ESOT loan payments, resulting in the accrual of tax liability and tax exposure, where the ESOP purchases could have and should have been structured in an alternative plan in order to defer the accrual of tax liability;

3.      Established the ESOP plans and the ESOT loans in a manner that was designed to maximize attorney fees, consulting fees, and to permit the defendants to assume control over plaintiffs' assets, rather than designing the ESOP plans and the ESOT loans for the maximum benefit and opportunity of the plaintiff;

4.      Negligently structured the ESOP plan, ESOT loans and acquisition of the QRP, resulting in the imposition of tax obligations, penalties and interest, attorney fees and accounting fees, that would otherwise not have been incurred by the plaintiff;

5.      Engaged in multiple, conflicted relationships with a variety of individuals and business entities, resulting in the ultimate destruction of any benefit that might have been enjoyed by plaintiffs from the transfer of the shares of stock into the ESOP programs;

6.      Squandered plaintiffs' investment by dealing with Optech, Derivium and other brokerage firms under circumstances where the "accounts" that were established were improperly organized, improperly supervised, failed to adhere to the requirements of § 1042, and furnished others with an opportunity to profit from brokerage fees, commissions, acquisition fees, and fraud, all at the expense of the plaintiff;

7.      Negligently ingratiated representatives of the law firm, and other Defendants named herein, into positions of authority, management and control of the various ESOP funds and ESOT loans, at the expense of plaintiff; and

8.      Other acts of negligence and malpractice to be more fully described as discovery is completed.

Count 2 of the complaint, entitled "negligence" appears to be directed at all of the Defendants, with the possible exception of the Defendant-attorneys and law firm.  For the most part, count 2 repeats the allegations of count 1.

Count 3 is entitled "breach of contract," and alleges that "Defendants entered into contracts with the plaintiff, under the terms of which the Defendants were, each of them, obligated to acquire

and hold Qualified Replacement Property, consistent with the rules and regulations governing §
1042 exchange."  Plaintiffs allege that Defendants breached this contract, resulting in the IRS
disallowing certain transactions; the imposition of taxes, interest, attorney fees, and accounting fees;
and the inability of Plaintiffs to reclaim QRP.

Count 4 is entitled "fraud," and generally alleges that each Defendant made multiple
representations of material fact, which were false when they were made, and were intended to induce
Plaintiffs' reliance; Plaintiffs relied on the misrepresentations when they acted.  Count 5 is entitled
"fraudulent concealment," and generally alleges that each Defendant intentionally withheld
information from Plaintiffs that would otherwise have allowed Plaintiff to discover the negligence,
malpractice, breaches of contract, and fraud of the various Defendants.

Finally, count 6 is entitled "concert of action," and alleges that Defendants acted "pursuant
to a common design intended to acquire plaintiffs' funds, to feign the acquisition of [QRP], to secure
commissions, profits, attorney fees, consulting fees, and other remuneration from the plaintiff, with
the intention and expectation that plaintiffs would not receive the [QRP] that he was induced to
purchase by the concert of action."

The Defendant-attorneys and law firm's motion to dismiss or compel arbitration appears to
clarify certain aspects of Plaintiffs' allegations.  [Dkt. # 9].  In February 2004, the Defendant-law
firm entered into a written attorney-client fee agreement with DirecTech, which was signed by
Defendant Johanson as managing partner of the Defendant-law firm and Woody Bilyeu as President
of DirecTech.  The fee agreement provides:

> DirecTech and the Attorney hereby agree that any and all disputes arising pursuant to any
> of the terms of this agreement or which relate in any manner whatsoever to the Services
> provided by the attorney to or on behalf of DirecTech which cannot be resolved in a
> reasonable time by discussions between the Attorney and DirecTech shall be submitted to

binding arbitration, pursuant to the Federal Arbitration Act, before the American Arbitration Association pursuant to its then existing rules. The Arbitration shall be held in Napa County of the State of California.

Def. Br. Ex. C; [Dkt. # 9-5].

On or about January 14, 2004, the Defendant-law firm entered into a written attorney-client fee agreement with Comm-Craft, which was signed by Defendant Johanson as managing partner of the Defendant-law firm and Woody Bilyeu as President of Comm-Craft. Def. Br. Ex. D; [Dkt. # 9-6]. The agreement contained the same arbitration provision as the DirecTech agreement, discussed above.

Finally, in June 2004, the Defendant-law firm sent a written attorney-client free agreement to Plaintiff Schafer at Michigan Microtech. Def. Br. Ex. E; [Dkt. # 9-7]. The fee agreement contains the same arbitration provision as the DirecTech and Comm-Craft agreements, discussed above. Unlike the other two agreements, however, Defendants have not provided a signed copy of the agreement. Defendants state that while they have been unable to locate a signed copy, Michigan Microtech received and paid for a substantial amount of legal services in accordance with the terms of the fee agreement.

Defendants represent that in November 2007, the IRS notified Plaintiffs that it did not agree with the positions that Plaintiffs had taken with respect to the ESOP transactions outlined in Plaintiffs' amended complaint. Defendants represent that Plaintiffs requested that the Defendant-law firm represent them. Initially, the law firm issued invoices to Plaintiffs and sent Plaintiffs retainer agreements containing arbitration provisions. Def. Br. Ex. F; [Dkt. # 9-8]. The retainer agreements mailed to each Plaintiff on January 17, 2008, are attached to Defendants' brief, but are not signed by Plaintiffs. Def. Br. Ex. G; [Dkt. # 9-9]. An affidavit of Defendant Johanson states that

-12-

after paying initial invoices, Plaintiffs requested that the Defendant-law firm provide its legal services solely in its capacity as corporate counsel to the corporations, not the individuals. Def. Br. Ex. A; [Dkt. # 9-3]. Defendant-attorneys and law firm contend that all of the work performed by them related to Plaintiffs' claims was performed in its capacity as corporate counsel to the corporate clients. They contend that the corporate clients paid for all of the legal fees and expenses; Plaintiffs and other shareholders did not pay for the services. Defendant-attorneys and law firm represent that they did not have fee-splitting or other arrangements with any of the other Defendants and that the law firm did not have any economic interest in Plaintiffs investing in loans with Optech.

In their brief in response to the Defendant-attorneys and law firm's motion to dismiss or compel arbitration [Dkt. # 19], Plaintiffs contend that Johanson billed Plaintiffs individually for certain services, the invoices were paid by Plaintiffs individually, and the conduct of Johanson and the law firm demonstrates that an attorney-client relationship existed with the Plaintiffs individually. Plaintiffs acknowledge that Johanson sent a proposed engagement letter to them individually in January 2008, but contends that the law firm had already begun representing them as individuals before the IRS as early as October 2007. Plaintiffs contend that they intentionally did not sign the engagement letter because they did not want to agree to arbitration. They contend that they called Johanson, informed him that they would not sign the agreement, that he had already agreed to represent them, and that he "got them into this mess, so he should get them out." Plaintiffs represent that Johanson agreed to continue their representation without additional fees so long as they did not disclose the arrangement. An email sent by Johanson to Plaintiffs on February 1, 2008, confirms free representation, but does not discuss the previously mailed engagement letter or arbitration provision. Pl. Resp. Br. Ex. 54.

-13-

In their response to Plaintiffs' motion for affirmative relief, the Defendant-attorneys and law firm contend that they advised Plaintiffs of the risk that the IRS would challenge the characterization of the loans as sales and assess taxes, but Plaintiffs chose to assume the risk of the tax advantage. [Dkt. # 37].  Defendants also emphasize that the taxes that were eventually assessed are the same taxes that Plaintiffs would have paid on the ESOP sales in the absence of a § 1042 election. Defendants contend that they merely provided legal services for hourly fees, while the business and investment decisions were made by independent corporations and Plaintiffs.  Defendants contend that Plaintiffs' allegations that they have been deprived of their QRP investments are false because Plaintiffs chose to enter into contracts that grant them return of the QRP only if they repay the loans in amounts that exceed the value of the QRP, in order to minimize taxes.

II

On April 3, 2009, the Defendant-attorneys and law firm filed a motion to dismiss the claims against attorney defendants or to compel arbitration of claims against them, and to dismiss two attorney defendants for lack of personal jurisdiction [Dkt. # 9].  On May 4, 2009, Plaintiffs filed a response [Dkt. # 19] to Defendants' motion.  The same day, Plaintiffs also filed a motion for affirmative relief that the claims by Plaintiffs against the Johanson Defendants are not arbitrable [Dkt. # 21].  On June 12, 2009, the Defendant-attorneys and law firm filed a response [Dkt. # 37] to Plaintiffs' motion for affirmative relief.  No replies were filed.  Other than the specific request for affirmative relief, Plaintiffs' motion does not identify any additional substantive issues not raised by Defendants' motion to dismiss or compel arbitration; thus, the two motions will be discussed in tandem.

A

The FAA requires a federal court to stay an action when an issue in the proceeding is referable to arbitration, *see* 9 U.S.C. § 3, and to compel arbitration when one party fails or refuses to comply with the provisions of an enforceable arbitration agreement. *See* 9 U.S.C. § 4; *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 573 (6th Cir.2003) (observing that "any doubts regarding arbitrability must be resolved in favor of arbitration"). The United States Supreme Court has found that these provisions "manifest a 'liberal federal policy favoring arbitration agreements.' " *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002); *see also Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (noting that there is "a well-established rule that any doubts regarding arbitrability should be resolved in favor of arbitration").

Nonetheless, "[b]efore compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). "Because arbitration agreements are fundamentally contracts, [federal courts] review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007).[3]

Under Michigan law, the elements of a valid contract are (1) parties competent to enter into

---

[3] State contract law governs "provided the contract law applied is general and not specific to arbitration clauses." *Fazio*, 340 F.3d at 393. This is because the FAA preempts "state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (emphasis in original) (explaining that "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts").

-15-

a contract, (2) a proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. Ct. App. 1991). "In order to form a valid contract, there must be a meeting of the minds on all the material facts." *Kamalnath v. Mercy Memorial Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992). " 'Meeting of the minds' is a figure of speech for mutual assent." *Id.* at 503. "A contract is made when both parties have executed or accepted it, and not before." *Id.* The party seeking to enforce the contract has the burden to show the existence of the contract. *Id.* Notably, the absence of a signature is not necessarily fatal to a finding of an agreement. Michigan law permits an inference that an offeree accepted the terms of the agreement when assent is signaled through conduct. *Pakideh v. Franklin Commercial Mortgage Group, Inc.*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995) ("If an offer does not require a specific form of acceptance, acceptance may be implied by the offeree's conduct.") (internal citation omitted). *See also Seawright*, 507 F.3d at 978 (finding that "arbitration agreements under the FAA need to be written, but not necessarily *signed*") (emphasis in original) .

Defendants contend in their motion that "[f]ive theories for binding nonsignatories to arbitration agreements have been recognized: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel," quoting *Javitch*, 315 F.3d at 629. Defendants propose that "a nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a *direct* benefit from the contract while disavowing the arbitration provision," quoting *id.* (explaining the holding in *Thomson-CSF v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995), without necessarily adopting the holding) (emphasis in original). In other words, a nonsignatory cannot seek to enforce contract rights while avoiding that contract's requirement of arbitration. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlangen GMBH*, 206 F.3d 411,

418 (4th Cir. 2000).

Defendants contend that in this case, Plaintiffs' claims arise out of the attorney-client relationship created by the attorney-client fee agreements between the corporations and the Defendant-law firm. Even though Defendants have not advanced a signed copy of the Michigan Microtech agreement, they contend that the arbitration provision is enforceable because the corporation performed, namely by payment of attorney fees, pursuant to the contract, and Defendants performed their services pursuant to the contract. Defendants further contend that Plaintiffs personally stood to gain by deferring or even eliminating significant tax liability as a result of the legal services provided to the corporate clients pursuant to the fee agreements, making them direct beneficiaries of the agreement for professional services. Thus, Defendants conclude that Plaintiffs should be bound by the arbitration provisions even though they are not signatories as individuals.

In contrast, Plaintiffs contend that the arbitration agreements relied on by the Defendant-attorneys and law firm do not govern the professional services that were provided to them. Plaintiffs emphasize that invoices were furnished to Plaintiffs individually and paid for by Plaintiffs, not the corporate clients. Plaintiffs identify invoices dated December 19, 2007, and February 20, 2008, sent to each Plaintiff. Plaintiffs contend that the services reflected by these invoices were provided to Plaintiffs individually concerning tax and estate planning and their respective disputes with the IRS. Plaintiffs also emphasize that, under Michigan law, the "benchmark" of an attorney-client relationship is the "rendering of legal advice and legal services by the attorney and the client's reliance on that advice or those services," quoting *Macomb County Taxpayers Ass'n v. L'Anse Creuse Pub. Schs.*, 564 N.W.2d 457, 462 (Mich. 1997) (also noting that "[t]he attorney's right to be

-17-

compensated for his advice and services arises from that relationship; it is not the definitional basis of that relationship"). Plaintiffs contend that they individually sought and received tax advice on their personal income taxes from Defendants in connection with the § 1042 purchases of QRP from 2003 to 2007.

Plaintiffs further contend that the ESOP transactions that provided the funds that "Defendants stole" are only "tangentially connected," if not unrelated to this action. Plaintiffs contend that they do not seek a benefit from or to enforce the fee agreements related to the ESOP transactions. Thus, they conclude that any benefit they received as individuals under the fee agreements between the Defendant-law firm and the corporations was indirect, and that, as nonsignatories, they cannot be compelled to arbitrate their claims. Additionally, they contend that their claims are outside of the scope of the arbitration agreement because their malpractice and fraud claims arise out of the "defective tax advice regarding § 1042 deferral treatment of QRP, and not the ESOP transactions services." Finally, Plaintiffs emphasize that the action does not involve damages to the corporations, it involves damages incurred by Plaintiffs as individuals and caused by Defendants.

In their response to Plaintiffs' motion for affirmative relief, Defendants emphasize that Plaintiffs or their trusts each paid approximately $4,000 for the limited legal services performed between October 10, 2007 and January 2, 2008, which is reflected by the invoices sent directly to Plaintiffs individually. Defendants contend that those limited services are not related to the wrongdoing alleged in the pleadings; the majority of Plaintiffs' allegations in the first amended complaint describe the ESOP transactions. The corporations that entered the arbitration agreements paid more than $500,000 for the legal services related to the transactions. Defendants contend that

Plaintiffs were direct beneficiaries because unless the ESOPs and the ESOTs were created through the legal services provided under the agreements with arbitration clauses, Plaintiffs could never have become eligible to make an investment in QRP to defer taxes on the sale of the common stock to the ESOTs. Finally, Defendants emphasize that the corporations paid for these services in conformity with the written, signed agreements, which suggests that the Defendant-attorneys and law firm performed their services pursuant to the written agreements.

At this juncture, the structure of the transactions and the portions of the transactions, conduct, or advice challenged by Plaintiffs is sufficiently vague such that the Court is unable to determine the scope of the arbitration agreements entered by the corporations of which Plaintiffs were shareholders or entered by Plaintiffs themselves, and whether Plaintiffs claims fall within the scope of the arbitration agreement. However, Plaintiffs have advanced facts, which if true, would substantiate Plaintiffs' allegations that they were incidental, if not direct, intended beneficiaries of the Defendant-attorneys' legal advice, in addition to the corporate clients. Additionally, Defendant-attorneys and law firm have not advanced an explanation of any effort to address the issue of their professional responsibility to Plaintiffs. If any written waivers of conflicts of interest limiting the scope of the Defendants professional responsibility to their corporate clients exist, they have not been proffered.

It would appear that at least a certain amount of discovery is necessary before the Court is able to make a determination whether Plaintiffs' claims are subject to the arbitration agreements. Based on the above, the Defendant-attorneys and law firm's motion [Dkt. # 9] will be denied without prejudice as to this issue. Likewise, Plaintiffs' motion for affirmative relief that the claims by Plaintiffs against the Johanson Defendants are not arbitrable [Dkt. # 21] will be denied without

prejudice.

B

The Defendant-attorneys and law firm contend in their motion that the Court does not have personal jurisdiction over Defendants Connor and Huang. A motion to dismiss for lack of personal jurisdiction is brought pursuant to Rule 12(b)(2). In deciding a Rule 12(b)(2) motion, courts may consider matters outside of the pleadings, such as affidavits, without converting the motion to dismiss into a summary judgment motion under Rule 56. If the district court rules on a Rule 12(b)(2) motion before trial, as in this case, it has the discretion to adopt any of the following courses of action: (1) to determine the motions based on affidavits alone; (2) to permit discovery, which would aid in resolution of the motion; or (3) to conduct an evidentiary hearing on the merits of the motion. *Serras v. First Tenn. Bank Nat'l Ass'n.*, 875 F.2d 1212, 1214 (6th Cir. 1989).

The burden rests on the plaintiff to establish the existence of personal jurisdiction over the defendant. *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir. 1980). In satisfying this burden, the "plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has [personal] jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). However, when determining whether there have been sufficient contacts with the forum state to establish personal jurisdiction, the court must interpret the pleadings and affidavits in the light most favorable to the plaintiff. *Id.* at 1459.

A federal court sitting in diversity may exercise personal jurisdiction over an out-of-state defendant only after confirming that the state long-arm statute authorizes jurisdiction over the nonresident defendant, and that the exercise of personal jurisdiction would not deny the defendant the constitutional right to due process of law. *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484

-20-

U.S. 97, 104 (1987). Generally, there are two types of personal jurisdiction: general personal jurisdiction and specific or limited personal jurisdiction. The principles of general jurisdiction are applied when the plaintiff's cause of action is unrelated to the defendant's in-state activities. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984). Specific jurisdiction is applied when the plaintiff's cause of action arises out of the defendant's transactions of business with the forum state. *Id.* at 414 n.8.

In this case, Plaintiffs do not allege that Defendants Connor and Huang engaged in any ongoing in-state activities upon which general jurisdiction could be based. Therefore, this Court must determine whether specific personal jurisdiction exists over Defendants Connor and Huang individually. Under Michigan's long-arm statute regarding specific jurisdiction over individuals, Mich. Comp. Laws § 600.705(1), personal jurisdiction will attach if a cause of action arises out of the defendant's "transaction of any business within the state." The phrase, "any business within the state," has been interpreted broadly because the term "any" includes "each" and "every" and comprehends even "the slightest" business transactions. *Sifers v. Horen*, 188 N.W.2d 623, 624 n.2 (Mich. 1971). Thus, the Michigan long-arm statute is generally interpreted to reach to the limits of due process.

The due process inquiry asks whether a defendant has established such "minimum contacts" with the forum state, "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). This standard is satisfied, and a defendant is subject to in personam jurisdiction, when contacts with the "forum State are such that [the defendant] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

-21-

The Sixth Circuit has further refined the due process analysis by setting forth a three-part test to determine whether specific jurisdiction exists over a nonresident defendant. In *Cole v. Mileti*, the court outlined the analysis:

> First, the defendant must purposefully avail himself of the privilege of conducting activities within the forum state; second, the cause of action must arise from the defendant's activities there; and third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make its exercise of jurisdiction over the defendant fundamentally fair.

133 F.3d 433, 436 (6th Cir. 1998) (internal citations omitted).

First, "purposeful availment" occurs when "the defendant's contacts with the forum state 'proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State.' " *Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 477, 478 (6th Cir. 2003) (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996)). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " *Id.* "Purposeful availment" is "more than a passive availment of the forum state's opportunities," it is a "deliberate undertaking." *Id.*

Second, a cause of action clearly arises from purposeful availment if the cause of action would not exist but for the contacts cited. *See Theunissen*, 935 F.2d at 1461; *Payne v. Motorists' Mutual Ins. Cos.*, 4 F.3d 452, 456 (6th Cir. 1993). Although this does not require that Plaintiffs' claims arise "formally and directly" from Defendants' contacts with Michigan, the claims must still "have a substantial connection with the defendant's in-state activities." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1275 (6th Cir. 1998). "[W]hen the operative facts of the controversy are not related to the defendant's contact with the state," the cause of action does not arise from that contact.

-22-

*Id.*

Third, and finally, the reasonableness of asserting jurisdiction is assessed by considering "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest in other states in securing the most efficient resolution of controversies." *Cole*, 133 F.3d at 435.

In their motion, and in declarations of Defendants Connor and Huang, Defendants assert that neither Defendant Connor nor Huang has transacted any business within Michigan, within the meaning of § 600.705(1). Defendants do not explain the basis for their assertion; rather, Defendants focus on whether Defendants Connor or Huang "cause[d] an act to be done, or consequences to occur, in the state resulting in an action for tort." § 600.705(2). According to Defendants, both Defendants Connor and Huang were both "very junior associates" and did not cause any act to be done in Michigan. Defendants represent that neither Defendant Connor nor Defendant Huang were licensed attorneys at the time of the 2003 ESOP transaction identified in Plaintiffs' amended complaint. Additionally, Defendants represent that Defendant Huang was not even an attorney or employed by the Defendant-law firm at the time of the 2004 and 2005 ESOP transactions identified in Plaintiffs' amended complaint.

Defendant Connor's declaration states that she is a California resident and has never been to Michigan and has never met either Plaintiff in person. Def. Br. Ex. H. Her declaration states that she performed all of her legal services related to this case while located in California. Similarly, Defendant Huang's declaration states that she has never been to Michigan. Def. Br. Ex. I. Her declaration states that she performed the majority of her legal services related to this case while located in California; she met the Plaintiffs in September 2006, in Maysville, Kentucky, and in

October 2007, in Chicago, Illinois.

Defendants also contend that the Court's exercise of jurisdiction would not comport with due process. Defendants contend that Defendants Connor and Huang did not purposefully avail themselves of the privilege of doing business in Michigan because they have never been to Michigan or transacted business within Michigan. Defendants describe Defendants Connor and Huang's connection as "fortuitous" based on the fact that the law firm they chose to work for has some clients who happen to be in Michigan, and they happened to be assigned to work for those clients.

Defendants contend that the claims pled by Plaintiffs are not related to the minimal contacts that Defendants Connor or Huang had with Michigan. Defendants explain that the 2005 transaction was performed for DirecTech, a Delaware corporation, and DTSW/Comm-Craft, a Louisiana corporation. The 2006 transaction involved DTHC, which is a Delaware corporation. Additionally, neither Defendant Connor nor Huang were licensed attorneys when services were performed for the 2004 transaction involving Michigan Microtech, a Michigan corporation. Thus, Defendants contend that because connections between Defendants Huang and Connor and Michigan are few, and not directly related to Plaintiffs' claims, Plaintiffs' claims do not "arise from" Defendant Connor's and Defendant Huang's activities in Michigan.

Finally, Defendants contend that exercise of personal jurisdiction would not be "reasonable" because there would be a substantial burden on Defendants Connor and Huang when they are junior attorneys, the legal services referenced in the complaint were provided before they became attorneys, their legal services were not performed in Michigan, and their primary legal work was for Delaware and Louisiana corporations.

In response, Plaintiffs contend that Defendant Connor was highly involved in the purchasing

of QRP and in defending Plaintiffs in their disputes with the IRS.  For example, on November 21, 2005, Defendant Connor emailed Block certain loan documents drafted by Defendant Johanson.  On August 21, 2006, Defendant Connor furnished instructions to Plaintiff Schafer regarding the initial round of QRP purchases and directing sales through Jesup & Lamont Securities.  Similarly, Plaintiffs assert that Defendant Huang was involved in responding to the Department of Labor subpoenas on behalf of Plaintiffs in connection with investigation of the 2004 Michigan Microtech ESOT transaction.  For example, on August 14, 2007, Defendant Huang emailed Plaintiffs a draft response to the subpoena.  Plaintiffs contend that Defendant Huang also represented Plaintiff Schafer in his dispute with the IRS, including preparing a summary of the transaction to give to the IRS.  Finally, Defendant Huang communicated via telephone, email, facsimile, private courier services, and via first class mail while Plaintiff Schafer was in Michigan.

Plaintiffs contend that it is well-settled that jurisdiction may not be avoided simply because a defendant has never physically been present in a forum state, citing *Jeffrey v. Rapid Am. Corp.*, 529 N.W.2d 644 (Mich. 1995).  Plaintiffs contend that due process is met because Defendants purposefully directed legal advice to a Michigan resident, to be acted on in Michigan, resulting in a fraud on the Michigan client, the Michigan State Tax Department, and the IRS.  Additionally, Plaintiffs contend that their claims arise out of Defendants' activities, consisting of "the fraudulent tax scheme and improper handling of state and federal investigations of that scheme."  Finally, Plaintiffs contend that jurisdiction is "reasonable" because Plaintiffs contend that the State of Michigan has a strong interest in this dispute and protecting Michigan residents from fraudulent tax shelters promoted by out of state "tax experts" such as Defendants.  Michigan also has a strong public policy interest in holding professionals who solicit business from Michigan and agree to serve

Michigan residents to their common-law and statutory responsibilities.

Similar to the issue of compelling arbitration, the Court is unable to determine whether personal jurisdiction exists at this time, and finds that discovery is necessary to resolve the question. *See Serras*, 875 F.2d at 1214 (noting the court's discretion to allow discovery to resolve the issue of personal jurisdiction). The contours of Defendants Connor and Huang's involvement in the law firm's activities giving rise to Plaintiffs' claims are unclear. However, Plaintiffs have alleged purposeful contacts by Defendants, which, if true, would justify at least limited personal jurisdiction. While Defendants may not have been involved at the time that the earlier transactions originated, significant involvement in the later transactions may be enough to confer personal jurisdiction, particularly if Defendants were involved with representing Plaintiffs in regards to Plaintiffs' dispute with the IRS arising from the Michigan Microtech transaction. Thus, Defendants' motion as to personal jurisdiction will be denied without prejudice.

### III

Defendant Wachovia Securities filed a "motion to dismiss claims/compel arbitration" [Dkt. # 17] on May 4, 2009. On July 7, 2009, Plaintiffs filed a notice of voluntary dismissal as to Defendant Wachovia Securities. Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), a plaintiff may dismiss a party to an action without a court order by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." "During that period, the court has no discretion to deny such a dismissal." *Aamot v. Kassel*, 1 F.3d 441, 443 (6th Cir. 1993). Thus, assuming that Defendant Wachovia Securities has not filed an answer or motion for summary judgment, Plaintiffs' notice of dismissal is effective without a court order.

On July 21, 2009, the Defendant-attorneys and law firm filed a "response" [Dkt. # 44] to

Plaintiffs' notice of dismissal, contending that Defendant Wachovia Securities cannot be voluntarily dismissed by Plaintiffs.  The Defendant-attorneys and law firm contend that the motion to dismiss claims/compel arbitration filed by Defendant Wachovia Securities should be construed as a motion for summary judgment because exhibits are attached that were not attached to Plaintiffs' complaint.

Notwithstanding the attachment of any additional materials, Defendant Wachovia Securities' motion is not construed as a motion for summary judgment precluding voluntary dismissal under Rule 41.  *See, e.g.*, *Aamot*, 1F.3d at 44-45 (reasoning that "a 12(b)(6) motion accompanied by extraneous materials" is only converted to a motion for summary judgment "at the discretion of the court, and at the time the court affirmatively decides not to exclude the extraneous matters").  *See also Brown v. T-Ink, LLC*, No. 07-13111, 2007 WL 4098207, at *3-4 (E.D. Mich. Nov. 16, 2007) (determining that a motion to compel arbitration is not considered a motion for summary judgment, and relying on *Hamilton v. Shearson-Lehman Am. Express, Inc.*, 813 F.2d 1532, 1535 (9th Cir. 1987); *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 142 (7th Cir. 1978); *Aggregates (Carolina), Inc. v. Kruse*, 134 F.R.D. 23, 25 (D.P.R. 1991)).

The Court has not yet considered Defendant Wachovia Securities' motion, thus, there is no justification for concluding that the motion has been converted to a motion for summary judgment. Accordingly, Plaintiffs' notice of voluntarily dismissal is effective as to Defendant Wachovia Securities without further order of the Court.  In light of this conclusion, Defendant Wachovia Securities motion to dismiss claims/compel arbitration will be denied as moot.

IV

Accordingly, it is **ORDERED** that Defendant-attorney and law firm's motion to dismiss claims against attorney Defendants or to compel arbitration of claims against them and to dismiss

-27-

two attorney Defendants for lack of personal jurisdiction [Dkt. # 9] is **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that Plaintiffs' motion for affirmative relief that the claims by Plaintiffs against the Johanson Defendants are not arbitrable [Dkt. # 21] is **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that Defendant Wachovia Securities motion to dismiss or compel arbitration [Dkt. # 17] is **DENIED AS MOOT**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 17, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 17, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---

-28-